UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MALIKAH M. WHITE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:12-CV-142 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff Malikah White, who is proceeding *pro se*, appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

**I. PROCEDURAL HISTORY**

White applied for SSI and DIB in April and May 2008, respectively, alleging that she became disabled as of December 31, 2003. (Tr. 114-23.) For purposes of her DIB application, White must show that she was disabled before her DIB-insured status expired on December 31, 2008. (Tr. 32); *see Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that she was disabled on or before her date last insured in order to recover DIB benefits).

---

[1] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

The Commissioner denied White's application initially and upon reconsideration, and White requested an administrative hearing. (Tr. 68-90.)  On August 19, 2010, a hearing was conducted by Administrative Law Judge ("ALJ") Jennifer Fisher, at which White, who appeared *pro se*; her husband; and a vocational expert testified. (Tr. 28-67.)  On February 25, 2011, the ALJ rendered an unfavorable decision to White, concluding that she was not disabled because she could perform a significant number of jobs in the economy. (Tr. 9-22.)  The Appeals Council denied White's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3); 20 C.F.R. §§ 404.981, 416.1481.

White filed a complaint with this Court on May 2, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.)  In this appeal, White contends that the ALJ improperly considered the opinion of her treating cardiologist, Dr. Swint, and that new evidence from him dated September 26, 2012, supports her assertion. (Docket # 14.)

## II.  FACTUAL BACKGROUND[2]

### *A.  Background*

At the time of the ALJ's decision, White was thirty-four years old; had a high school education and one year of college; and possessed work experience as a beauty consultant, computer designer, cook, delivery driver, and laundry mat attendant. (Tr. 41, 134, 147, 152.) She alleged on her disability application that she became disabled due to ventricular septal defect

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 677-page administrative record necessary to the decision.

("VSD"),[3] constant mild heart pain, shortness of breath, and panic attacks. (Tr. 146.)

At the hearing, White testified that she lives with her husband, who also does not work, and her three children, ages twelve, six, and five. (Tr. 50.)  White stated that she does not have a problem performing tasks unless she experiences a chest pain episode or an anxiety attack, which occur every day without warning and last three to four minutes. (Tr. 52-54.)  During an episode, White feels "numb," like she "can't breathe, inhale or exhale . . . ." (Tr. 53.)  Her panic attacks have caused her to stop driving and stay home most of the time, as she does not like to be around people. (Tr. 48-49, 54.)  She has no hobbies, but does sing at church and has a best friend who comes to visit her at times. (Tr. 55.)  White stated that she takes Zoloft and Xanax, but has received no other mental health treatment.[4] (Tr. 38.)

### B. Summary of the Medical Evidence Before the ALJ

In February 2005, White saw Dr. Robert Swint, a cardiologist, upon referral from her family practice physician. (Tr. 287-90.)  She informed Dr. Swint that she had a VSD repaired at age four. (Tr. 287.)  She complained of episodes of two types of chest pain in the last several years: sharp chest pressure near her sternum and short, sharp pain in her left breast with occasional numbness in her arm without exertion. (Tr. 287.)  Dr. Swint noted that White was very active in going to school to become a radiology technician, taking care of two children, and managing a household. (Tr. 287.)  He diagnosed her with residual heart murmur and

---

[3] VSD is "one or more openings in the interventricular septum, producing a shunt between ventricles." THE MERCK MANUAL 2409 (18th ed. 2006).  Such defects "may close spontaneously during infancy or require surgical repair." *Id.*

[4] White's husband also testified at the hearing, essentially corroborating her testimony. (Tr. 57-60.)  He added that he sometimes has to take her to the hospital after an episode or attack because she cannot catch her breath and calm down. (Tr. 58-59.)

hypertension and ordered a stress echocardiogram to determine if she had residual VSD. (Tr. 289.)

The stress echocardiogram was normal, showing no pulmonary hypertension or VSD. (Tr. 285.) A Doppler image of White's heart showed moderate mitral valve regurgitation due to mitral valve prolapse and a mildly dilated left ventricle. (Tr. 344.) Dr. Swint diagnosed her with mitral valve prolapse and valve degeneration and moderately severe mitral valve regurgitation. (Tr. 285.)

In May 2006, White complained of some shortness of breath going up and down stairs but not overt congestive heart failure. (Tr. 282.) Dr. Swint noted that White's main problem was continued pain in the left side of her chest. (Tr. 282.) He affirmed his previous diagnoses of mitral valve prolapse, valvular degeneration; and a history of moderately severe mitral valve regurgitation. (Tr. 282-83.) An echocardiogram in June reflected results similar to those one year earlier—moderate to severe mitral valve regurgitation with a prolapsing mitral valve. (Tr. 279.) White was encouraged to quit smoking. (Tr. 281.)

In September 2006, White complained to Dr. Swint of continued left chest pain without exertion, but no dizziness or congestive heart failure symptoms. (Tr. 277-78.) He diagnosed her with musculoskeletal chest pain and mitral valve prolapse with possibly aggravating sharp chest pains in the left chest. (Tr. 278.) He noted that she was also having some panic attacks, which were common with mitral valve prolapse; he prescribed medication. (Tr. 278.)

In May 2007, White underwent a transesophageal echocardiogram ("TEE") after experiencing abdominal and chest discomfort. (Tr. 516.) The test showed mild mitral valve prolapse; moderately severe mitral valve regurgitation, eccentric in nature; mild tricuspid

regurgitation; a trileaflet aortic valve with mild aortic insufficiency; a normal pulmonic valve with mild pulmonic insufficiency; a mildly dilated left ventricle; and normal left and right ventricular function. (Tr. 246-47, 275.)

In August, White had a normal stress echocardiogram with good past-exercise reserve cardiac capacity and a low probability of coronary artery ischemia. (Tr. 310.)  Dr. Swint observed that the test showed moderately severe to severe mitral valve regurgitation. (Tr. 310.) Two months later, a TEE showed moderately severe regurgitation, but no evidence of significant pulmonary hypertension. (Tr. 273-74.)  White was asymptomatic and reported no changes in her stamina or breathing patterns, even with exercise. (Tr. 273-74.)  Dr. Swint expected that in the next five years, White's regurgitation would become severe even if she continued to be relatively asymptomatic; at that time then, he might consider a repair of the mitral valve leaflets. (Tr. 274.) White was very reluctant to proceed with any repair while she was still asymptomatic. (Tr. 274.)

In June 2008, Dr. Kinzi Stevenson examined White at the request of the state disability office. (Tr. 415-18.)  White was uncertain how much she could lift, but estimated that she could walk one mile, stand for ten minutes at a time, and sit for thirty minutes at a time; she performed all household tasks other than mowing the lawn. (Tr. 415.)  Dr. Stevenson reported that White had a heart murmur that was loudest in the mitral valve region, but an otherwise normal exam; he diagnosed her with VSD, anxiety, and chest pain with shortness of breath. (Tr. 417.)  Dr. Stevenson noted that White's chest pain was not angina. (Tr. 417.)  He opined that she was limited in walking long distances due to a heart murmur, but had no appreciable sitting limitations and could lift and carry twenty pounds two-thirds of the workday. (Tr. 417.)

In July 2008, Dr. M. Ruiz reviewed White's record and opined that she could lift ten

5

pounds frequently and twenty pounds occasionally; stand or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, and crawl; and occasionally climb ramps and stairs, but never ladders, ropes, and scaffolds. (Tr. 419-26.)

The following month White told Dr. Swint that she was getting short of breath with any activity and that humidity bothered her. (Tr. 432.) He thought that White was getting close to the point of needing a valve repair, commenting that "[o]therwise, she will need to be on Social Security Disability." (Tr. 432.) He prescribed Lisinopril for hypertension and noted that she had not been taking her Nifedical. (Tr. 432.)

In September 2008, a stress test showed a mildly reduced exercise capacity but no evidence of heart ischemia. (Tr. 430, 435-36.) White reported some shortness of breath upon exertion, and Dr. Swint suspected, but was not certain, that her mitral valve regurgitation had become severe. (Tr. 430.) Accordingly, Dr. Swint diagnosed her with "probably severe" mitral valve regurgitation and mild aortic valve insufficiency, recommending that she undergo another TEE. (Tr. 430.) He indicated that if the TEE confirmed severe regurgitation, he would refer her to Dr. Bill Deschner to determine if the valve could be repaired or whether she needed valve surgery. (Tr. 430.) He further noted that White had more shortness of breath and decreased stamina and that she did not achieve her expected exercise capacity on the stress echocardiogram. (Tr. 431.) He stated: "With this severity of regurgitation, I believe she should have Social Security disability." (Tr. 431.) The results of the TEE, however, ultimately showed moderate mitral valve regurgitation, not severe, and minimal mitral valve prolapse. (Tr. 443, 605.)

In October 2008, Dr. J.V. Corcoran, a state agency physician, reviewed White's record and concluded that she could lift twenty-five pounds frequently and fifty pounds occasionally; stand or walk about six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, and crawl; and occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds. (Tr. 437-44.)  He observed that Dr. Swint's "suspected severe findings" penned in September 2008 were ultimately not borne out by the objective testing. (Tr. 443.)

A May 2009 x-ray showed that White's heart was mildly enlarged without acute change. (Tr. 599.)  In September, White reported significant shortness of breath to Dr. Swint. (Tr. 456, 565-66.)  A stress echocardiogram showed moderate to moderate-to-severe mitral valve regurgitation and good exercise functional capacity. (Tr. 570-71.)  The following month a TEE showed moderate to severe mitral valve regurgitation, which, based upon the results, was unlikely to be severe; no other significant valve abnormalities were noted, and left ventricle systolic function was normal. (Tr. 455-56.)  Dr. Swint wrote that the TEE reflected moderately severe mitral valve regurgitation and no evidence of any reversal flow into White's pulmonary veins, good left ventricle systolic function, and no pulmonary hypertension. (Tr. 652.)  He reiterated that White would need a mitral valve repair if she started to have severe mitral valve regurgitation, reversal of her pulmonary vein pressures, or if she became symptomatic. (Tr. 652.)  He thought that her medications were working well. (Tr. 652.)

In August 2010, a cardiology physical revealed a heart murmur, but an otherwise normal exam. (Tr. 649-50.)  White reported that she was essentially the same since her last visit in October 2009, but was having problems with anxiety. (Tr. 649-50.)  She was diagnosed with

7

moderate to severe mitral valve regurgitation, mitral valve prolapse, a history of atrial tachycardia and hypertension, and anxiety disorder with anxiety attacks. (Tr. 650.)

On August 11, 2010, Dr. Swint penned a letter, noting that White's hearing for her disability application was upcoming. (Tr. 647.)  He wrote that she had prolapse in two sections of the leaflet of the mitral valve due to valve degeneration and a history of tachycardia. (Tr. 647.) He indicated that the back flow across the mitral valve was moderately severe, as demonstrated in the stress echocardiogram and TEE, and "bordering on the point of becoming severe." (Tr. 647.)  He elaborated that because of valve degeneration, the back flow would probably reach the point of becoming severe and that she would require surgery to repair the leaflets or replace the valve. (Tr. 647.)  He explained that White did not necessarily experience shortness of breath with activity, but did feel anxious. (Tr. 647.)  He also wrote that her vital signs had tolerated the mitral valve regurgitation and that she did not complain of any chest discomfort, shortness of breath when supine, or congestive heart failure symptoms. (Tr. 647.)  He indicated that he would continue to closely monitor her to determine whether she needed mitral valve surgery. (Tr. 647.)

### C. Medical Evidence Dated After the ALJ's Decision

On September 26, 2012, after the ALJ's February 25, 2011, decision and the Appeals Council's March 23, 2012, denial of request for review, Dr. Swint penned a letter in furtherance of White's disability application, reporting that she had recently underwent an echocardiogram due to her increasing mitral valve regurgitation and symptoms. (Pl.'s Opening Br. 6-7.)  The test revealed that White had indicators of pulmonary hypertension, a significantly enlarged left atrium, and the beginnings of dilatation of her right ventricle and atrium. (Pl.'s Opening Br. 6.) Dr. Swint opined that White's mitral valve sufficiency had worsened considerably, becoming

moderately severe to severe. (Pl.'s Opening Br. 6.)  She was also having increased shortness of breath on exertion, chest pain, and palpitations, but no stroke symptoms, dizziness, or shortness of breath when lying down. (Pl.'s Opening Br. 6.)

Dr. Swint wrote that White was "unable to work" in that she was "having difficulty just walking up about 6 or 8 steps and, therefore, . . . [was] totally disabled from any type of employment." (Pl.'s Opening Br. 7.)  He also cautioned that she was in danger of damaging her heart and at risk of pulmonary edema—conditions he thought would improve upon repair of the valve leaflets. (Pl.'s Opening Br. 7.)  He indicated that White would be undergoing a heart catheterization and coronary artery study and that he had referred her to Dr. Deschner to consider the timing on the mitral valve repair. (Pl.'s Opening Br. 7.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v.*

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

10

*Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On February 25, 2011, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 9-22.) She found at step one of the five-step analysis that White had not engaged in substantial gainful activity since her alleged onset date and at step two that her mitral valve prolapse/regurgitation/degeneration, history of paroxysmal atrial tachycardia, hypertension, and anxiety were severe impairments. (Tr. 11.) At step three, the ALJ determined that White's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 12.)

Before proceeding to step four, the ALJ determined that White's symptom testimony was not reliable to the extent it was inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and ten pounds frequently; stand and/or walk six hours in an eight-hour workday, and sit for six hours in an eight-hour workday; must alternate between sitting and standing, but the positional change will not render the claimant off task; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme cold and heat; avoid more than office level noise; avoid moderate exposure to operational control of moving machinery and unprotected heights; limited to routine, repetitive tasks with no sudden or unpredictable workplace changes; limited to tasks that do not require more than superficial interaction with the public, supervisors, or coworkers, meaning that successful

> performance of the job duties involves working primarily with things and not people (incidental interaction or proximity would be tolerated).

(Tr. 14.) Based on this RFC and the VE's testimony, the ALJ concluded at step four that White was unable to perform any of her past relevant work. (Tr. 20.) The ALJ then concluded at step five that she could perform a significant number of unskilled, light jobs within the economy, including electrical accessories assembler, small products assembler, and mail sorter. (Tr. 20-21.) Accordingly, White's claims for DIB and SSI were denied. (Tr. 21-22.)

### C. The ALJ's Consideration of Dr. Swint's Opinion Is Supported by Substantial Evidence

White contends that the ALJ erred in rejecting the opinion of her treating cardiologist, Dr. Swint, who stated that she is disabled as a result of her heart condition. The ALJ's consideration of Dr. Swint's opinion, however, is supported by substantial evidence.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature

and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); 20 C.F.R. §§ 404.1527(c), 416.927(c).

Furthermore, a claimant "is not entitled to DIB [or SSI] simply because [her] treating physician states that [she] is 'unable to work' or 'disabled.'" *Clifford*, 227 F.3d at 870. Rather, the determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); SSR 96-5p. In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006); 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). "Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether the individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5p; *see Frobes*, 2006 WL 3718010, at *8.

Here, the ALJ thoroughly considered Dr. Swint's medical records, including his September 11, 2008, note articulating that he "believe[d] [White] should have Social Security disability." (Tr. 19.) In fact, the ALJ penned *not less than nine paragraphs* discussing Dr. Swint's various opinions and clinical findings. (*See* Tr. 16-19.) Nonetheless, the ALJ ultimately rejected Dr. Swint's September 2008 assertion of disability, choosing to assign greater weight to his August 2010 opinion (Tr. 19), as well as the opinions of the consulting and reviewing physicians, who concluded that White retained the physical capacity to perform light or medium

work (Tr. 20). *See generally Dixon*, 270 F.3d at 1177 (acknowledging that a consulting physician's opinion may offer "the advantages of both impartiality and expertise"); *Smith v. Apfel*, 231 F.3d 433, 442-43 (7th Cir. 2000) (emphasizing that a consulting physician may bring expertise and knowledge of similar cases).

In discounting Dr. Swint's September 2008 assertion of disability, the ALJ explained:

[I]n an addendum to a September 11, 2008, office visit, Dr. Swint recorded, "I believe she should have Social Security disability." However, as noted by the State Agency consultant, this opinion appears to have been based upon Dr. Swint's assumption that mitral valve regurgitation had become severe. Dr. Swint's diagnosis that day included mitral valve regurgitation, "which is probably severe," and he noted that a decision on surgery would be depend on "physiologic findings of her severe mitral val[v]e regurgitation." Dr. Swint's assumption, however, was incorrect as a TEE performed on October 1, 2008, was absent of markers of severe mitral valve regurgitation.

(Tr. 19 (internal citations omitted).)  The ALJ then also observed that the letter Dr. Swint wrote in August 2010, the same month as White's hearing, confirmed that her mitral valve dysfunction was not yet severe and that she did not have any chest discomfort or significant shortness of breath. (Tr. 647.)

Of course, greater weight is given to a physician's opinion that is supported by objective medical evidence. *Smith*, 231 F.3d at 441; *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999); 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).  Here, the ALJ observed that Dr. Swint's assertion of disability in September 2008 appeared to be based on his assumption that her mitral valve regurgitation had become severe—which was later belied by objective testing. Consequently, the ALJ discounted Dr. Swift's assertion of disability, and her reason for doing so is easily traced and adequately supported. *See Books*, 91 F.3d at 980 ("All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered

the important evidence . . . and to enable us to trace the path of the ALJ's reasoning." (citation and internal quotation marks omitted)).

In any event, as explained *supra*, the determination of a claimant's RFC is an issue reserved to the Commissioner, 20 C.F.R. §§ 404.1527(d), 416.927(d), and "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance," SSR 96-5p. *See generally Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."). Thus, despite White's plea to the contrary, the ALJ is under no obligation to afford Dr. Swint's opinion of disability a significant amount of weight. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

And, insofar as the consulting and state agency physicians' opinions conflict with Dr. Swint's September 2008 opinion, the ALJ is required to weigh conflicting evidence, ultimately deciding which evidence to believe, and this Court does not resolve evidentiary conflicts. *Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) (deeming unconvincing the claimant's complaint that the ALJ gave greater weight to an earlier mental examination than to one conducted later and concluding that "[w]eighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do"). The Court will not accept White's invitation to merely substitute its judgment for the Commissioner concerning the weight to apply to Dr. Swint's September 2008 assertion of disability. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the Court is not allowed to substitute its judgment for the ALJ by "reweighing

15

evidence" or "resolving conflicts in evidence").

In sum, the ALJ sufficiently evaluated Dr. Swint's September 2008 opinion that White was disabled and adequately explained her rationale for assigning it the weight that she did, allowing this Court to adequately trace her path of reasoning. *See Books*, 91 F.3d at 980. Consequently, White's first argument does not merit a remand of the Commissioner's final decision.

### *D. A Sixth Sentence Remand Is Not Appropriate*

White submitted with her opening brief a letter from Dr. Swint dated September 26, 2012 (Pl.'s Opening Br. 6)—that is, *after* the ALJ rendered his decision and the Appeals Council denied her request for review.[6] In the letter, Dr. Swint stated that he saw White for a follow-up visit and that her mitral valve insufficiency had "worsened considerably" and was now "moderately severe to severe"; that her mitral valve regurgitation was "severe"; that she was having more shortness of breath and chest pain; and that he was referring her to Dr. Deschner to evaluate the timing of her mitral valve repair. (Pl.'s Opening Br. 6.) He also opined that White was "unable to work" in that she was "having difficulty walking up about 6 or 8 steps and, therefore, . . . is totally disabled from any type of employment" and that she should use his letter to further her disability application. (Pl.'s Opening Br. 7.)

Of course, the Court may not reverse an ALJ's decision based on evidence that was never presented to the ALJ or Appeals Council. *See Micus v. Bowen*, 979 F.2d 602, 606 n.1 (7th Cir. 1992). White, thus, apparently is requesting that the Court remand this matter to the Commissioner pursuant to the sixth sentence of 42 U.S.C. § 405(g) to consider this new

---

[6] Although White attached other documents to her opening brief, the only document not already in the record was Dr. Swint's September 26, 2012, letter.

evidence. Contrary to White's suggestion, Dr. Swint's September 26, 2012, letter does not present a basis for remand.

The sixth sentence of 42 U.S.C. § 405(g) permits a remand "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." For sixth sentence purposes, "[e]vidence is 'new' if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Schmidt*, 395 F.3d at 742 (quoting *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997)). New evidence is "material" if "there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered . . . ." *Perkins*, 107 F.3d 1296; *see also Schmidt*, 395 F.3d 742; *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993).

Although Dr. Swint's September 26, 2012, letter is new, it does not meet 42 U.S.C. § 405(g)'s materiality requirement. "Medical evidence postdating the ALJ's decision, unless it speaks to the patient's condition at or before the time of the administrative hearing, could not have affected the ALJ's decision and therefore does not meet the materiality requirement." *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008) (citing *Schmidt*, 395 F.3d at 742; *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990)).

Dr. Swint's letter was written almost two years after White's August 2010 hearing before the ALJ, seventeen months after the ALJ rendered his decision, and six months after the Appeals Council denied her request for review. Consequently, this letter reflects White's current and apparently worsening condition as of September 2012, rather than the condition she was in during the time the Social Security Administration was considering her application. *See Kapusta*,

900 F.3d at 97.  Because this letter does not speak to White's condition during the time of the administrative proceedings, there is no "reasonable probability" that it would affect the ALJ's decision and is therefore immaterial.  *Perkins*, 107 F.3d 1296; *see Getch*, 539 F.3d at 484.  "If [White] has developed additional impairments, or [her] impairments have worsened, since [her] first application for benefits, [she] may submit a new application." *Getch*, 539 F.3d at 484; *accord Kapusta*, 900 F.3d at 97.

In sum, because the additional evidence White submitted with her brief is not material, she has failed to satisfy the standard for a remand under the sixth sentence of 42 U.S.C. § 405(g). Accordingly, any purported request for a remand to consider the additional evidence is denied.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against White.

SO ORDERED.

Enter for this 12th day of March, 2013.

                                        S/Roger B. Cosbey
                                        Roger B. Cosbey,
                                        United States Magistrate Judge